

**NUMBER 13-13-00307-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ROEL ALVALREZ LOPEZ,** Appellant,

**v.**

**THE STATE OF TEXAS,** Appellee.

---

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Longoria
### Memorandum Opinion by Chief Justice Valdez

A jury found appellant Roel Alvarez Lopez ("Lopez") guilty of the offense of murder, a first degree felony, and sentenced him to thirty-seven years' imprisonment in the Texas Department of Criminal Justice—Institutional Division. *See* TEX. PENAL CODE ANN. § 19.02 (West, Westlaw through 2015 3d R.S.). By two issues, Lopez contends that (1)

the trial court erred in failing to suppress evidence that he claims constituted the fruit of statements that he made during an allegedly illegal police interrogation, and (2) he was deprived of effective assistance of counsel.   We affirm.

## I.   Background

Cecilia Escamilla found her brother, the decedent, dead at home on the evening of Sunday, December 4, 2011.  The San Juan Police Department opened an investigation into his death that night.  The next day, an anonymous tipster gave the police the name of "Roli Lopez who lived in Alamo."   Lopez became the focus of their investigation.

On the morning of Wednesday, December 7, 2011, the police went to Lopez's home and informed him about their investigation.  After a brief exchange, the police handcuffed and transported Lopez to the police station for further questioning.  According to Lopez and his mother, as the police escorted him away, he asked his mother to call his lawyer.  The police officers denied hearing this request.  Shortly after the police brought him into custody, Lopez's mother retained two attorneys to assist him.

When Lopez arrived at the police station on Wednesday morning, officers questioned him concerning his whereabouts on the previous Sunday.  The initial interview was not recorded.  However, according to the police, Lopez signed a written waiver of his *Miranda* rights.  Lopez did not recall signing this waiver and claimed that he requested an attorney.  According to the police, during this unrecorded interview, Lopez identified three individuals that could account for his whereabouts on Sunday:  Jennifer Gonzales, Danny Anguiano, and Joel Gonzalez.

Approximately two hours into questioning, but still during Wednesday morning, the police obtained access to a video camera and began recording the interview.  Lopez

2

appeared in handcuffs. The police did not read Lopez his *Miranda* rights at the start of the video. The police offered Lopez a bottle of water and gave him an opportunity to take a cigarette break. The police also indicated that they could arrange to have Lopez's mother bring him some food if he was hungry, but Lopez declined. Although Lopez had a splint on his finger, he did not indicate the need for medical attention. The interview continued for the remainder of the morning with several breaks in questioning. At no point during the recorded interview did Lopez request to speak to an attorney.

Throughout the recorded interview, Lopez consistently denied any involvement in the decedent's death; he again referenced Jennifer Gonzales, Danny Anguiano, and Joel Gonzalez; and he offered an alibi that consisted of him being at home during a certain time frame on the previous Sunday. However, when Lopez's alibi did not match up with information that his family members provided concerning his whereabouts on Sunday, the police began to suspect that Lopez was not telling the truth. The police then asked Lopez whether it would be appropriate to charge his family members with filing a false report in light of the fact that the information they provided did not match up with his story. Despite what the police believed to be inconsistencies in his alibi, Lopez maintained his innocence throughout the interview.

Over the next two days, Lopez remained in custody. The attorneys that Lopez's mother hired went to the police station to visit with Lopez on Thursday and Friday, but the authorities did not allow them access to Lopez. According to Lopez, during this time, the police put him in a cell with hostile individuals, refused his requests to see his attorneys, threatened to arrest his family, and did not feed him.

3

By Friday afternoon, Lopez informed the police that he wanted to confess. After Lopez indicated that he wanted to confess, the police fed him a plate of barbeque. After finishing his food, Lopez confessed that he shot the decedent with a gun. Lopez's confession was recorded and reduced to writing. Thereafter, Lopez was charged with capital murder.

After Lopez confessed, the police contacted Jennifer Gonzales, Danny Anguiano, and Joel Gonzalez—the three individuals who Lopez identified during his initial interview. After contacting these individuals, the police obtained additional incriminating evidence against Lopez, which, in relevant part, included the following: (1) their statements that tended to connect Lopez to the crime; (2) the murder weapon, which Lopez borrowed from Joel Gonzalez at a barbeque on the evening of the murder; and (3) several personal items belonging to the decedent and his family, which Lopez gave to Jennifer Gonzalez after the murder.

## A. Suppression Hearing

Prior to trial, Lopez moved to suppress his written and oral statements at the police department arguing the police interrogated him illegally. Specifically, Lopez argued that the police obtained his statements (1) by ignoring his request for counsel in violation of his *Miranda* rights, and (2) by using coercive tactics to get him to talk (and eventually confess) in violation of his due process right to be free from coercion under the Fourteenth Amendment. In addition to his statements, Lopez sought to suppress any statement that Jennifer Gonzales, Danny Anguiano, and Joel Gonzalez provided to the police, and any physical evidence that the police obtained through them.[1] Lopez argued that this

---

[1] At the suppression hearing, Lopez clarified that his motion to suppress sought to exclude the following evidence:

evidence was inadmissible under the fruit of the poisonous tree doctrine due to the allegedly illegal police interrogation.

Midway through the suppression hearing, the State made an important announcement to the trial court; the State announced that it did not intend to introduce any statement that Lopez gave to the police.[2]  The State explained that it elected not to introduce Lopez's statements out of a concern that the police had not complied with certain statutory requirements pursuant to Texas Code of Criminal Procedure article 38.22.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West, Westlaw through 2015 3d R.S.) (providing, as a prerequisite to admissibility, that the accused's statement capture the reading and waiver of his *Miranda* rights).

With the admissibility of Lopez's statements no longer at issue, the focus of the suppression hearing turned to the question of whether the fruit of the poisonous tree doctrine applied to exclude the statements of Jennifer Gonzales, Danny Anguiano, and Joel Gonzalez, and the physical evidence that the police obtained through them.  The State argued:

> What I'm asking the Court to suppress is the statements made by Joel [Gonzalez], whose identity came through what we classify as illegal questioning of Mr. Lopez.  So they learn of Joel [Gonzalez], his statements and any physical evidence that was gathered as a result.
>
> Daniel Anguiano, which I think the State agrees that if Daniel Anguiano is inadmissible, then so are everybody else that was at that barbeque essentially because they learned of those people through Daniel Anguiano and they learned of Daniel Anguiano through Mr. Lopez.
>
> And Jennifer Gonzalez, who they also learned from Mr. Lopez.  And then any subsequent physical evidence that they gathered through them.
>
> So it's just all evidence that stems from those individuals.

[2] The excluded statements consisted of Lopez's videotaped interview on Wednesday and his written and videotaped confession on Friday.

5

[T]hat evidence should not be suppressed because, what we're saying is that there were statutory requirements that were not met, which would make the oral statements, the recordings inadmissible, which is an evidentiary rule. However, the exclusionary rule does not apply to this situation because there were no Constitutional violations that would allow the 'fruit of the poisonous tree' doctrine to apply to this situation. So the taint for the original oral statements made by the Defendant does not carry to the evidence that was obtained as a result of those statements.

Citing *Baker v. State*, the State clarified that the fruit of the poisonous tree doctrine did not apply unless there was actual police coercion. 956 S.W.2d 19, 23 (Tex. Crim. App. 1997) (holding that "[i]n the absence of actual [police] coercion, the fruits of a statement taken in violation of *Miranda* need not be suppressed under the 'fruits' doctrine"). Lopez agreed with this articulation of the law but argued that the fruits of his statements should be suppressed because the police used coercion to get him to talk.

To resolve this issue, it appears that the trial court determined, and the parties agreed, that the focus of the suppression hearing should center on the circumstances surrounding Lopez's detention on his first day in custody when Lopez told the police about Joel Gonzalez, Daniel Anguiano, and Jennifer Gonzalez.

At the conclusion of the suppression hearing, the trial court orally (1) granted Lopez's motion to suppress as to his statements, and (2) denied his motion to suppress as to the fruits of his statements. The trial court did not enter findings of fact and conclusions of law for its ruling.

## II. Motion to Suppress

By his first issue, Lopez argues that suppression of his statements also required suppression of the fruits of his statements because the police violated (1) his *Miranda* right to counsel, and (2) his due process right to be free from police coercion.

6

## A. Standard of Review

We review a trial court's decision on a motion to suppress for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). In a motion to suppress hearing, the trial court is the "sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony." *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). As such, the trial court may "believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted." *Id.* This is so because it is "the trial court that observes first hand the demeanor and appearance of a witness[.]" *Id.* On appeal, we should afford "almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We should also afford the same amount of deference to the "trial court's rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id.* Finally, we conduct a de novo review where "the resolution of mixed questions of law and fact do not turn on an evaluation of credibility and demeanor." *Id.*

When, as here, the trial court rules on a defendant's motion to suppress without entering findings of fact, we must view the evidence "in the light most favorable to the trial court's ruling" and "assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Ross*, 32 S.W.3d at 855. The trial judge's decision will be sustained if it is correct on any theory of law applicable to the case. *Id.*

7

## B. Applicable Law

### i. Sources of Law

Lopez's first issue requires a review of three sources of law: (1) the *Miranda* rule; (2) the Texas confession statute; and (3) the right to be free from police coercion under the due process clause. First, the *Miranda* rule secures the Fifth Amendment right against self-incrimination in the context of custodial interrogations by requiring that a person subject to police questioning receive the following warnings: "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Second, the Texas confession statute implements the *Miranda* rule by requiring, among other things, that the accused's statement be either written or recorded and contain a reading of the *Miranda* warnings, along with the accused's waiver thereof. TEX. CODE CRIM. PROC. ANN. art. 38.22.

Third, the due process clause of the Fourteenth Amendment requires that an accused's statement be voluntary and not the product of police coercion. *See Armstrong v. State*, 718 S.W.2d 686, 693 (Tex. Crim. App. 1985). To determine whether the circumstances render an accused's statement coerced and involuntary, courts look at whether his will was "overborne" by police coercion. *Id.* Courts look to the totality of the circumstances surrounding the statement in making this determination. *Id.* (citing *Davis v. North Carolina*, 384 U.S. 737 (1966)). Relevant circumstances include the "length of detention, incommunicado or prolonged detention, denying a family access to a defendant, refusing a defendant's request to telephone a lawyer or family member, and physical brutality." *Id.* When the issue is raised, the State must prove voluntariness by

8

a preponderance of the evidence.  *Juarez v. State*, 409 S.W.3d 156 (Tex. App.—Houston [1st Dist.] 2013 pet. ref'd).

## ii. Exclusionary Remedy

A statement taken in violation of any one of these three sources of law is inadmissible; however, only a violation of the third source of law—the due process right against police coercion—entitles the accused to suppression of the *fruits* of his statement. *See United States v. Patane*, 542 U.S. 630, 634–44 (2004) (plurality opinion); *Chavez v. Martinez*, 538 U.S. 760, 769 (2003); *see also Baker*, 956 S.W.2d at 22–24 (citing *Michigan v. Tucker*, 417 U.S. 433, 448–49 (1974))*; In re H.V.*, 252 S.W.3d 319, 329 (Tex. 2008); *Contreras v. State*, 312 S.W.3d 566, 583 (Tex. Crim. App. 2010); *State v. Cruz*, No. PD-0082-14, 2015 WL 2236982, at *6 (Tex. Crim. App. May 13, 2015).  "In determining whether evidence is inadmissible as fruit of the poisonous tree, the critical issue is whether the evidence was gained by exploitation of an illegality." *Graham v. State*, 964 S.W.2d 738, 741 (Tex. App.—Beaumont 1998) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)), *aff'd*, 994 S.W.2d 651 (Tex. Crim. App. 1999).

## C. Analysis

### 1. *Miranda* Claim

Lopez argues that the trial court erred in failing to suppress the fruits of his statements because the police violated his *Miranda* right to counsel.  However, as noted above, the exclusionary remedy for a *Miranda* violation is limited to suppression of Lopez's statements—not the fruits of his statements.  *See Patane*, 542 U.S. at 634; *see also Baker*, 956 S.W.2d at 23–24; *In re H.V.*, 252 S.W.3d at 329; *Contreras*, 312 S.W.3d at 583.  Thus, assuming without deciding that the police violated Lopez's *Miranda* rights,

9

we cannot conclude that the trial court abused its discretion in following well-settled law by refusing to suppress the fruits of his statements.[3]  *See Ross*, 32 S.W.3d at 855.

### 2. Police Coercion Claim

We now turn to Lopez's second argument that the trial court erred in failing to suppress the fruits of his statements because the police obtained them through coercion. Unlike his *Miranda* claim, this claim entitled Lopez to suppression of the fruits of his statements if there was "actual [police] coercion."  *See Baker*, 956 S.W.2d at 23; *see also Armstrong*, 718 S.W.2d at 693.  We afford almost total deference to the trial court's ruling on this issue because it involved a mixed question of law and fact, which turned on an evaluation of credibility and demeanor.  *See Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000); *Guzman*, 955 S.W.2d at 89.  Because the trial court did not enter written findings of fact, we must view the evidence in the light most favorable to its ruling.  *See Ross*, 32 S.W.3d at 855.  We must also assume that the trial court made implicit findings of fact in support of its ruling as long as those findings are supported by the record.  *Id*. Finally, we must affirm the trial court's ruling if it is correct on any theory of law applicable to the case.  *Id*.

---

[3] Lopez argues that the Texas exclusionary rule should apply to exclude physical evidence derived from *Miranda* violations because things have changed since the last time the court of criminal appeals took up the issue in *Baker v. State*, 956 S.W.2d 19, 23 (Tex. Crim. App. 1997).  Specifically, Lopez points out that in 2000, after the court of criminal appeals decided *Baker*, the Supreme Court in *Dickerson* abandoned its characterization of *Miranda* as a prophylactic rather than a constitutional rule.  *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (concluding that *Miranda* announced a constitutional rule that Congress may not supersede legislatively). Lopez argues that *Dickerson's* characterization of *Miranda* as a constitutional rule calls for a reassessment of *Baker's* holding, which was premised on a view that *Miranda* announced a prophylactic rule.  We disagree.  Four years after *Dickerson* was decided, the Supreme Court in *Patane* clarified that *Dickerson* did not change the rule that physical evidence is admissible even if gained from questioning that violates *Miranda*.  *See United States v. Patane*, 542 U.S. 630, 643 (2004) (plurality opinion).  Furthermore, in 2008, the Texas Supreme Court echoed this holding in the context of a juvenile proceeding. *See In re H.V.,* 252 S.W.3d 319, 328 (Tex. 2008) (holding that "violations of *Miranda* do not justify exclusion of physical evidence resulting therefrom").  Thus, in light of *Patane* and *In re H.V.*, and without binding authority to the contrary, we decline Lopez's invitation to reassess *Baker's* holding.

Guided by this standard of review, the record supports the trial court's implied finding that Lopez identified Jennifer Gonzales, Danny Anguiano, and Joel Gonzalez during his initial interview with the police, which took place on the morning of his first day in custody. Lopez does not argue that his will was overborne by police coercion during this initial interview. Instead, to establish police coercion, Lopez points to evidence—disputed by the State—that occurred after his initial interview. Specifically, Lopez argues that the police detained him for approximately three days, put him in a cell with hostile individuals, denied him access to his lawyers and family members, deprived him of food, and threated to arrest his family.[4] The State responds that these circumstances, even if true, are irrelevant because Lopez made the fruit-producing statements during his initial interview, and he does not argue that the police obtained those statements through coercion. We agree with the State.

The critical issue for purposes of applying the fruits doctrine is whether the police obtained the fruits at issue by exploiting Lopez's right to be free from coercion—i.e., by exploiting an alleged illegality. *See Graham*, 964 S.W.2d at 741; *see also Wong Sun*, 371 U.S. at 471. With this in mind, the trial court could have reasonably determined that Lopez's will was not overborn by police coercion during his initial interview—i.e., the fruit-producing interview; therefore, the fruits doctrine did not apply to exclude the fruits of Lopez's statements because the police could not have obtained that evidence by exploiting an illegality. *Id.* Furthermore, Lopez provides no legal authority to support a contrary position. Viewing the evidence in the light most favorable to its ruling, we cannot

---

[4] We note that this evidence was not without dispute, as the trial court was faced with conflicting testimony from several witnesses at the suppression hearing regarding the deprivations Lopez claimed to have suffered.

conclude that the trial court erred in implicitly finding that Lopez's fruit-producing statements were voluntary and not the product of police coercion. *See Ross*, 32 S.W.3d at 855. We therefore overrule Lopez's first issue.

### III.    Conclusion[5]

We affirm the judgment of the trial court.

/s/ Rogelio Valdez
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
25th day of June, 2015.

---

[5] By his second issue, Lopez contends that, if his first issue was not preserved for appellate review, it was only because his trial counsel provided ineffective assistance by waiving the issue when he stated "no objection" as the State introduced the evidence that his motion to suppress unsuccessfully sought to exclude. Having already addressed the merits of Lopez's first issue, we have assumed, without deciding, that counsel's "no objection" statement did not waive his earlier-preserved claim. See *Thomas v. State*, 408 S.W.3d 877, 881 (Tex. Crim. App. 2013) (indicating that if it is clear from the record as a whole that the defendant did not intend to waive an earlier-preserved claim of error, then the claim has not been waived and should be resolved on the merits). We do so being guided by Texas Rule of Appellate Procedure 47.1, which requires that we "hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal." *See* TEX. R. APP. 47.1.